**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KAREN W. MANGOLD; SANFORD D.
MANGOLD, Colonel,
Plaintiffs-Appellees,

v.

ANALYTIC SERVICES, INCORPORATED
(The Anser Corporation); JOHN
FABIAN, Doctor, individually, and in
his capacity as officer and agent of
the Analytic Services, Incorporated

(The Anser Corporation); PAUL A.
ADLER, individually, and in his
capacity as officer and agent of the
Analytic Services, Incorporated
(The Anser Corporation),
Defendants-Appellants,

and

UNITED STATES OF AMERICA,
Defendant.

No. 94-1307

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-93-1635-A)

Argued: January 31, 1995

Decided: March 12, 1996

Before NIEMEYER and MICHAEL, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

Reversed and remanded by published opinion. Judge Niemeyer wrote the opinion of the court on immunity, in which Senior Judge Phillips joined; Senior Judge Phillips wrote the opinion of the court on subject matter jurisdiction, in which Judge Niemeyer joined; Judge Michael wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Thomas R. Bagby, EPSTEIN, BECKER & GREEN, P.C., Washington, D.C., for Appellants. Darrell Madison Allen, DARRELL M. ALLEN, P.C., Fairfax, Virginia, for Appellees. **ON BRIEF:** Bennett Boskey, VOLPE, BOSKEY & LYONS, Washington, D.C., for Appellants.

_____

**OPINION**

NIEMEYER, Circuit Judge, delivered the opinion of the court in Parts I, III, and IV (on the issue of absolute immunity), and PHILLIPS, Senior Circuit Judge, delivered the opinion of the court on the issue of subject matter jurisdiction.

NIEMEYER, Circuit Judge:

We must decide whether absolute immunity shields a government contractor from liability arising from statements it made in response to government investigators during an official investigation. In response to Air Force queries relating to charges of misconduct by an Air Force colonel in his dealings with a private government contractor, the contractor answered questions under oath and provided other information. When the colonel sued the contractor under common law for injury to the colonel's reputation and position, the contractor asserted the defense of absolute immunity, which the district court rejected. Because we conclude that the government contractor should not be subjected to state law tort claims based on statements it made in response to an official government investigation about its dealings with the government, we reverse the district court's ruling denying such immunity.

2

I

On the initiative of Lt. Col. James Rooney, a United States Air Force officer assigned to the Air Force's Resource Allocation team at the Pentagon, the Air Force Office of Special Investigations and the Inspector General opened an inquiry into the practices of Col. Sanford D. Mangold, who headed the team.[1] The investigation was undertaken to determine whether Col. Mangold abused his authority in his treatment of subordinates and in his dealings with the private sector. One aspect of the investigation focused specifically on allegations that Col. Mangold improperly exerted his influence to pressure a government contractor, Analytic Services, Inc. (which the parties refer to as "ANSER"), to hire a Mangold family friend. ANSER is a private corporation which contracts with the U.S. government to provide engineering and analysis services in connection with government acquisitions, particularly by the Air Force.

The investigation into Col. Mangold's activities was conducted by Air Force Brig. Gen. Raymond Huot. General Huot and his staff approached ANSER in June 1993 and inquired about Col. Mangold's effort to have ANSER hire Mrs. Betsy Worrell, a close friend of Col. Mangold's wife. Three ANSER officers responded to the investigators' questions and provided cassette tapes of telephone messages left by Col. Mangold on ANSER's telephone answering machine in November and December 1992.

In particular, Dr. John M. Fabian, ANSER's CEO, told Gen. Huot that during the late fall of 1992, Col. Mangold, on behalf of the Air Force, had requested use of ANSER's consulting services, which were available to units of the government on an open contract. In conjunction with his request, Col. Mangold suggested that ANSER hire Mrs. Worrell to provide those services. Despite the fact that Mrs. Worrell was not qualified to perform the job, Col. Mangold pressed the matter, implying that his team's use of ANSER's services depended on ANSER hiring Mrs. Worrell. Dr. Fabian stated that he told Col. Mangold, "I value the name of this company and I'm not interested in hiring somebody who was a friend of your wife's, in

_____

[1] At the time, the team was responsible for administering one quarter of the Air Force's procurement, involving $20 billion.

order to provide contract support." Dr. Fabian explained to Col. Mangold that because Mrs. Worrell did not have a college degree, she did not possess the preestablished qualifications necessary to provide the services Col. Mangold requested. According to Dr. Fabian, Mangold responded, "[I]f you can't do this I'll find a contractor who will." ANSER's vice president, Paul A. Adler, confirmed Dr. Fabian's testimony.

Transcripts of Col. Mangold's telephone messages left on ANSER's telephone answering machine during the period corroborate these witnesses' statements. These transcripts contain several messages in which Mangold repeatedly pressured ANSER to hire Mrs. Worrell. He stated in various messages:

> I'm real frustrated that you guys are not hiring Mrs. Worrell. I think that ah, this was an excellent opportunity for ANSER to get involved with XO [the team headed by Col. Mangold], to show some responsiveness, and work with us.

\* \* \*

> I would like to, uh, talk to you also about the fact that this is really a test case for ANSER and XO working together and if this one works out, we could probably see more opportunities for ANSER . . . .

\* \* \*

> I've run out of maneuvering room on, uh, uh, using other options in getting an individual like Mrs. Worrell on board by the end of the, ah, ah, by the end of this week, first part of next week when we expect the avalanche of budgetary work to come in.

When it became clear that ANSER would not accede to his entreaties, Col. Mangold canceled the Air Force's request for contract support from ANSER. According to the answering machine transcripts, he stated:

4

> While the individual you sent to us and brought over is very pleasant and, ah, and uh, intelligent young lady, we no longer need to have any ANSER support. . . . I want to make it absolutely, indelibly, and totally clear that any ANSER support for the Space CQ Dive team will not be provided through this office. . . . I appreciate John your help and all your ability to, in bringing an individual in the office, but I do not need nor do I contemplate ever needing any ANSER support for this Space CQ Dive Team.

Col. Mangold's immediate subordinate, Lt. Col. James Rooney, who was familiar with Col. Mangold's efforts on behalf of Mrs. Worrell, was concerned about the impropriety of Col. Mangold's actions and consulted with another subordinate of Col. Mangold, Capt. Anthony J. Russo, about his concern. As Capt. Russo related the events:

> Lt. Col. Rooney took me aside and also expressed serious concerns about the comments made to ANSER. He stated that he had already complained to Lt. Col. Mushaw and Col. Kingsbery (both from XOFS) and that he was going to meet with M Gen Hard (SAF/AQS) whom he knew well from a previous assignment. Lt. Col. Rooney stated that Col. Mangold was about to go too far and that he did not want to be involved in anything that might be illegal. He asked for my support. I agreed that Col. Mangold had made comments that could be misinterpreted by ANSER and promised that I would tell the truth about the meeting at ANSER, if asked. However, I told him that I would not personally go outside of our chain of command, and that I wanted to more forcefully express my objections directly to Col. Mangold before I would think of going over his head.

Following Lt. Col. Rooney's complaints to superior officers, the Air Force commenced an internal Air Force investigation, and Col. Mangold was transferred from his position as head of the Resource Allocation team.

Several months later, Col. Mangold and his wife, Karen, filed suit in a Virginia state court against ANSER, its executives, and Lt. Col.

5

Rooney for injuring their reputations and Col. Mangold's position with the United States Air Force and for intentional infliction of emotional distress. The seven-count complaint alleges both that the defendants defamed Col. and Mrs. Mangold by fabricating the charges of misconduct and that the defendants conspired to damage Col. Mangold's reputation and position. The Mangolds demand $15 million in compensatory damages and $5 million in punitive damages.

Lt. Col. Rooney removed the case to the United States District Court for the Eastern District of Virginia under 28 U.S.C. § 2679(d)(2), and the United States substituted itself for Lt. Col. Rooney as the party defendant under the Federal Tort Claims Act, 28 U.S.C. § 2679(d)(1). After the United States filed a motion for summary judgment for lack of jurisdiction,[2] the Mangolds voluntarily dismissed the United States as a party defendant.

ANSER and its employees also filed a motion for summary judgment, asserting, among other defenses, immunity for claims arising out of their responses to questioning and requests for information in the course of an official Air Force investigation into ANSER's contractual arrangement with the Air Force. The district court determined that it had discretion to retain jurisdiction over the case, even though the United States was no longer a party, to decide ANSER's immunity defense. After denying ANSER's immunity defense, the court remanded the case to the state court, purportedly under 28 U.S.C. § 1447(c).

This appeal was taken from the district court's ruling denying absolute immunity. See Nixon v. Fitzgerald, 457 U.S. 731 (1982) (denial of claim of absolute immunity is immediately appealable under collateral order doctrine).

_____

**2** The United States contended that Col. and Mrs. Mangold failed to exhaust their administrative remedies by filing an administrative claim with the Air Force; that the United States had not waived its immunity from the torts alleged in the complaint; and that the Mangolds' claims were barred by the decision in Feres v. United States, 340 U.S. 135 (1950) (holding that the United States was not liable for servicemen's injuries arising out of activity incident to military service).

6

II

As a threshold matter, we must address the suggestion that we lack subject matter jurisdiction to hear this appeal because the district court's ruling on absolute immunity was included in an order for remand, and certain remand orders are not reviewable. See 28 U.S.C. § 1447(d); Thermtron Products, Inc. v. Hermansdorfer, 423 U.S. 336 (1976) (limiting application of § 1447(d) to remand orders issued under § 1447(c)).

The appeal in this case challenges only the district court's ruling on absolute immunity, not its subsequent remand to state court. The fact that the two dispositions--denial of immunity and remand to state court--were included in a single order does not deprive us of jurisdiction to review the immunity ruling. See Waco v. U.S. Fidelity & G. Co., 293 U.S. 140 (1934). In Waco, the Court held that it had jurisdiction to review an order dismissing a party, even though the dismissal was included in a nonreviewable order remanding the case to state court. See also Jamison v. Wiley, 14 F.3d 222, 233 (4th Cir. 1994) (permitting review of a party-substitution order despite its inclusion in same paper with order of remand).

Accordingly, I conclude that we have jurisdiction to review the district court's interlocutory order denying the appellants absolute immunity.**3** See Nixon, 457 U.S. at 743. Alternatively, I concur in Judge Phillips' concurring opinion directed to the jurisdictional issue.

III

Much of the law of governmental immunity has been developed as part of the federal common law to protect a sphere of discretionary governmental action from the potentially debilitating distraction of defending private lawsuits. See, e.g. , Barr v. Matteo, 360 U.S. 564, 569-73 (1959) (plurality opinion); Westfall v. Erwin, 484 U.S. 292, 295 (1988). In Barr and Westfall, the Court recognized an absolute

_____

**3** Even if it were necessary to review the remand order, the provisions of 28 U.S.C. § 1447(d), as limited by Thermtron, do not immunize it from review. See Phillips, J., op. infra . In any event, we have jurisdiction to reach the immunity issue.

7

immunity from state law tort liability for federal officials exercising discretion while acting within the scope of their employment. Protecting government actors with absolute immunity, however, has its costs, since illegal and even offensive conduct may go unredressed. Such immunity also tends to undermine the basic tenet of our legal system that individuals be held accountable for their wrongful conduct. See Westfall, 484 U.S. at 295. For these reasons, the common law immunity recognized in Barr and Westfall is afforded only to the extent that the public benefits obtained by granting immunity outweigh its costs. Id. at 296 n.3.**4**

The absolute immunity recognized in Barr and Westfall is sufficiently broad to protect, as part of the sphere of discretionary governmental action, official decisions to investigate suspected fraud, waste, and mismanagement in the administration of government contracts. Official investigations of that type are critical to the efficient conduct of government and their value outweighs the interest of affording individuals redress against persons participating in the investigations for wrongful action. And because such investigations can be effective only if investigators are able to obtain the cooperation of witnesses, cooperating government employees should also be protected through immunity. If government employees cooperating in such investigations are left exposed to lawsuits filed by those under investigation, they might be reluctant to cooperate, even if they were eyewitnesses to improper conduct. Equally as important, in the absence of such protection, they might distort information in an effort to avoid exposure to tort liability.

_____

**4** In Westfall, the Court specifically invited Congress to establish legislative standards to define the contours of the official immunity available to federal employees involved in state law tort actions. 484 U.S. at 300. Congress responded with the Federal Employees Liability Reform and Tort Compensation Act, codified at 28 U.S.C. § 2679 and commonly referred to as the Westfall Act. The Act substitutes the United States as the sole defendant in any state law tort action against a federal employee for acts committed within the scope of the employee's office or employment, regardless of whether the employee's discretion was involved. At federal common law, absolute official immunity remains limited to discretionary functions.

8

Whether Barr and Westfall immunity also extends to persons in the private sector who are government contractors participating in official investigations of government contracts is less clear. Even though private persons under contract with the government act only partly in the public sphere, the public interest may demand that immunity protect them to the same extent that it protects government employees. The public interest in facilitating the government's policing of its contracting process--a process subject to the temptation of conflicting self interest and to the risks of undue influence and corruption--is perhaps as important as the public interest in facilitating the government's policing of itself. And to expose private government contractors who are responding to and cooperating with such investigations to the risk of state tort claims would chill the investigative effort to the same extent that exposing cooperating government employees would. Ultimately, to allow such tort liability, whether against government employees or private contractors, would tend to make government less efficient.

Extending such immunity to the private sector, in the narrow circumstances where the public interest in efficient government outweighs the costs of granting such immunity, comports with the principles underlying the immunity recognized in Barr and Westfall, since the scope of that immunity is defined by the nature of the function being performed and not by the office or the position of the particular employee involved. As the Court in Barr explained:

> The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government. The complexities and magnitude of governmental activity have become so great that there must of necessity be a delegation and redelegation of authority as to many functions, and we cannot say that these functions become less important simply because they are exercised by officers of lower rank in the executive hierarchy.

360 U.S. at 572-73. If absolute immunity protects a particular governmental function, no matter how many times or to what level that function is delegated, it is a small step to protect that function when delegated to private contractors, particularly in light of the govern-

9

ment's unquestioned need to delegate governmental functions. The government cannot perform all necessary and proper services itself and must therefore contract out some services for performance by the private sector. When the government delegates discretionary governmental functions through contracting with private contractors, therefore, the same public interest identified in Barr and Westfall--the interest in efficient government--demands that the government possess the ability meaningfully to investigate these contracts to ensure that they are performed without fraud, waste, or mismanagement.

Extending immunity to private contractors to protect an important government interest is not novel. See, e.g., Boyle v. United Technologies Corp., 487 U.S. 500 (1988). In holding that a government contractor providing helicopters for the military was not liable under state tort law for injury caused by a design defect, the Court in Boyle equated the liability of a private procurement contractor with that of a government official who might have beencalled upon to design and manufacture the same product:

> The present case involves an independent contractor performing its obligation under a procurement contract, rather than an official performing his duty as a federal employee, but there is obviously implicated the same interest in getting the Government's work done.

Id. at 505 (emphasis added). After observing that designing a helicopter for military performance is "assuredly a discretionary function," id. at 511, and that a government official performing the same function would therefore be protected by immunity under 28 U.S.C. § 2680(a) (Federal Tort Claims Act), the Court concluded:

> It makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a "significant conflict" with federal policy and must be displaced.

10

487 U.S. at 512 (footnote omitted). See also Yearsley v. Ross Constr. Co., 309 U.S. 18, 20-21 (1940).

We believe that the rationale for the protections articulated in Barr, Westfall, and Boyle also applies to the case before us to the extent that this case involves a discretionary governmental function which has been delegated to the private sector. This conclusion, however, does not fully resolve the issue of whether persons cooperating with an official government investigation, as distinguished from persons conducting the investigation, are protected. While the decision to conduct an investigation may be a discretionary act involving an exercise of judgment, see Westfall, 484 U.S. at 300, and as such may be protected by absolute immunity, the reasoning in Westfall provides only a partial foundation for protecting witnesses cooperating in an official investigation. The full justification for such immunity also draws on principles of that immunity which protects witnesses in government-sponsored investigations and adjudications.

The law provides immunity of varying degrees to both private citizens and public officials engaged in investigating and adjudicating disputes in order to ensure a meaningful government-sponsored judicial system. Thus, an absolute immunity shields witnesses testifying in court, see Briscoe v. LaHue, 460 U.S. 325, 335-36 (1983), and testifying before a grand jury. See Anthony v. Baker, 955 F.2d 1395, 1400 (10th Cir. 1992); Kincaid v. Eberle, 712 F.2d 1023 (7th Cir.), cert. denied, 464 U.S. 1018 (1983). And immunity also has been held to extend to witnesses giving testimony to public prosecutors, see Holmes v. Eddy, 341 F.2d 477, 480 (4th Cir.), cert. denied, 382 U.S. 892 (1965). The underlying policy for the grant of such immunity is long-standing:

> In the words of one 19th-century court, in damages suits against witnesses, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." Calkins v. Sumner, 13 Wis. 193, 197 (1860). A witness's apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. . . . And once a witness is on the stand, his

11

> testimony might be distorted by the fear of subsequent lia-
> bility.

Briscoe, 460 U.S. at 332-33 (citation omitted). In the absence of a privilege for such witnesses, the exposure to tort lawsuits would chill government-sponsored investigatory and adjudicatory efforts, threatening to undermine their reliability and therefore to erode confidence in the judicial function of government. Those negative consequences would far outweigh the benefit of giving individuals a right of redress for false testimony.

Accordingly, in the circumstances of this case, we recognize an absolute immunity that has two roots, one drawing on the public interest in identifying and addressing fraud, waste, and mismanagement in government, and the other drawing on the common law privilege to testify with absolute immunity in courts of law, before grand juries, and before government investigators. While this immunity has foundations well established in the common law, we take care to apply it to witnesses in the private sector only to the extent necessary to serve the greater public interest. Therefore we apply such immunity only insofar as necessary to shield statements and information, whether truthful or not, given by a government contractor and its employees in response to queries by government investigators engaged in an official investigation. See also Becker v. Philco Corp., 372 F.2d 771, 774 (4th Cir.) (holding a defense contractor immune from liability for an alleged defamatory report detailing possible security breaches by two employees), cert. denied, 389 U.S. 979 (1967); Holmes, 341 F.2d at 480-81 (granting stockbroker immunity for statements made to the SEC about a suspicion that a company was attempting to "bilk the public via the securities market"); Gulati v. Zuckerman, 723 F. Supp. 353, 358 (E.D. Pa. 1989) (granting absolute immunity to a defense contractor and its employees for allegedly defamatory statements about the company's former president in his dealings with the Department of Defense). Cf. Bradley v. Computer Sciences Corp., 643 F.2d 1029, 1033 (4th Cir.) (granting qualified immunity to defense contractor from libel suit for criticism of civil service employee based on constitutional right to criticize government), cert. denied, 454 U.S. 940 (1981).

Turning to the facts in this case, an official Air Force investigation was undertaken by Brig. Gen. Huot and the Office of Special Investi-

12

gations to determine whether Col. Mangold had been involved in any wrongdoing in his dealings with ANSER. Investigations conducted by the Air Force Office of Special Investigations are official actions designed to combat fraud, waste, abuse, and mismanagement in government, and the scope of Gen. Huot's investigation was limited, in his words, to inquiring into "the involvement of Sandy Mangold with ANSER Corp. . . . in trying to get a budget analyst hired and allegations which surrounded trying to get one Mrs. Betsy Worrell hired with ANSER in that process." ANSER did not initiate the investigation, but merely responded to the official Air Force inquiries. And nothing in the record suggests that ANSER and its employees volunteered any information beyond the scope of the Air Force's inquiries. Cf. Gulati, 723 F. Supp. at 358 (refusing to extend immunity to a letter written by contractor to the Small Business Administration which was not connected with a governmental investigation and not made in response to a government request). It was solely on the substance of the responses given by ANSER and two of its officers to these inquiries that Mangolds' tort claims against ANSER and its officers were based.

Because ANSER and its employees provided information only as requested by the government agency officially investigating Col. Mangold's dealings with ANSER, we hold that ANSER and its employees are absolutely immune from state tort liability based on any statements made and information given in response to queries made in the course of the Air Force's investigation. Accordingly, the ruling of the district court that such immunity does not attach is reversed.

PHILLIPS, Senior Circuit Judge, specially concurring, delivered the opinion of the court on the issue of subject matter jurisdiction:

I concur in Judge Niemeyer's opinion holding that we have jurisdiction to review the district court's no-immunity ruling and, on the merits, that the district court erred in that ruling. I write specially because I believe that under the unusual procedural circumstances, a proper disposition of the appeal requires that we review the remand order as well as the immunity ruling; that for that purpose we may inquire, sua sponte, into our jurisdiction to do so; that upon such an

13

inquiry, we do have jurisdiction for that purpose; and that upon that review error is apparent, requiring vacatur of the remand order.

I

The ANSER defendants' notice of appeal "designates" as the "judgment, order, or part thereof appealed from" "the Memorandum Opinion and Order dated and entered in this action on the 1st day of February, 1994." JA 327. That Order both denied the absolute immunity defense and remanded the action to the state court. JA 325.

Although none of the parties has challenged our jurisdiction to review either of these rulings, we must of course in this as any case satisfy ourselves, sua sponte, of our jurisdiction to resolve any merits issues properly presented for review. Here, the only merits issue formally presented for review is the propriety of the district court's immunity ruling. Appellant's Br. i. But, for reasons that follow, in order to address sua sponte our jurisdiction to review that substantive ruling, we must also address our jurisdiction to review the remand order, for the former may turn significantly on the latter.

A.

The principal problem with our jurisdiction to review the remand order is of course, 28 U.S.C. § 1447(d) which generally bars review, by any means, of orders remanding removed cases. Although Thermtron, 423 U.S. 336 (1976), established that only remands invoking one of the grounds specified in § 1447(c)--defect in removal procedure or lack of subject matter jurisdiction--come under § 1447(d)'s bar, the remand order here arguably does invoke lack of subject matter jurisdiction, hence does come under the bar. Indeed, at one point in the order the district court opined that "there is no longer any basis for federal jurisdiction", and the remand order concludes that it is entered "pursuant to 28 U.S.C. § 1447." If this was the actual ground invoked, we may not review this order even if it be manifestly, inarguably erroneous. See Gravitt, 430 U.S. 723 (1977).

But, powerful policy considerations and persuasive decisional authority support our power--and responsibility--to look past con-

14

textually ambiguous allusions and even specific citations to § 1447(c) to determine by independent review of the record the actual grounds or basis upon which the district court considered it was empowered to remand. First, it must be the case, as some courts have had the occasion to recognize, that neither the citation of § 1447(c) nor the failure to cite it as presumed authority for a remand is conclusive of the real question: whether one of its two grounds is the actual basis being invoked as authority for remand. See Kolibash, 872 F.2d 571, 573 (4th Cir. 1989) (failure to cite not conclusive; § 1447(c) basis found in record review); Kunzi, 833 F.2d 1291, 1293-94 (9th Cir. 1987) (§ 1447(c) cited, but further inquiry made to determine actual basis). If a review of the record discloses to a reviewing court's satisfaction that, notwithstanding any indications to the contrary, the actual basis upon which the court thought it was empowered to remand was neither of these, § 1447(d) does not bar review. In the instant case, the only question is whether the basis actually invoked was lack of jurisdiction.

B.

My reading of the record here satisfies me that, despite evident confusion and some backing and filling during the process, the district court remanded in the end not on the assumption that there was a "lack of jurisdiction" so that remand was compelled, but that though there was jurisdiction, there was discretion to remand. It is settled that when a district court remands on such a basis, § 1447(d) does not bar appellate review. See, e.g., In re Surinam Airways Holding Co., 974 F.2d 1255, 1257 (11th Cir. 1992); see also Carnegie Mellon v. Cohill, 484 U.S. 343 (1988) (court of appeals' review of discretionary remand of pendant state law claim affirmed by Supreme Court).

My analysis of the record on this point is as follows: The remand order was actually entered not in response to a motion to remand, but in consequence of a hearing on a motion by the United States to dismiss or for summary judgment on the merits and a motion of the ANSER defendants for summary judgment on the merits based upon their immunity defense. At the outset of the hearing it was revealed that the plaintiff had, in response to the United States' motion, voluntarily dismissed the United States. At that point the court's first suggestion of jurisdictional issues occurred. Having determined on

15

inquiry that there was not diversity between the remaining parties, the court inquired: "Then there is no longer any basis for federal jurisdiction to this, is there?" J.A. 307. Asking to be heard on that matter, counsel for the ANSER defendants noted that those defendants had raised a federal-immunity defense and suggested that in the situation thus presented, it was "appropriate" for the court to "retain[ ] jurisdiction based upon the assertion by the private defendants of a Federal-immunity defense." J.A. 308. Citing decisional authority, counsel argued that the existence of such a federal defense"provides the Court with federal jurisdiction." Id. And in a critical additional point, counsel (incorrectly) asserted, "Of course, in any event, . . . the Court under United Mine Workers v. Gibbs may retain jurisdiction over claims even if a Federal claim no longer exists in the case." Id. To which the court, also critically for our purposes, responded: "But it's purely discretionary with the Court whether to hold on to the case in the posture that it presently is in. [?]." Id. (emphasis added). To which ANSER counsel responded, with no demur by counsel for plaintiff: "That's correct, Your Honor. I would urge the Court to go ahead and decide the summary judgment motion . . . based upon the defendant's assertion of a Federal-immunity defense . . . ." J.A. 308-09. Counsel for ANSER then argued the merits of the federal defense in an extended colloquy with the court during with the court gave no indication that, at odds with counsel's suggestion, it actually lacked subject matter jurisdiction over the claim against the ANSER defendants. J.A. 309-13.

When, following this colloquy, plaintiffs' counsel was asked to respond, counsel first noted that "to the extent the Court does not feel it has jurisdiction over this claim, we would . . . welcome a remand to [the state] Court." J.A. 313. Counsel then turned to an argument on the merits of the immunity defense with the court engaging in substantive colloquy without suggesting any reservation about its jurisdiction to do so. J.A. 313-19. At the conclusion of counsels' opposing arguments on the merits, the district court made critical statements relevant to its understanding of the jurisdictional posture of the case: "I am going to take the [ANSER] defendants' motion for summary judgment under advisement . . . . [I]f I grant the motion for summary judgment, that moots out the case. It's over. If I do not grant it, I will be referring [sic] it back to the [state] Court, because there are issues of essentially state law that are involved in the case. It's more

16

appropriate for them to be handled in a state court. . . . [G]iven the nature of the charges, they are better handled in State Court if we get to that point." J.A. 320-21 (emphasis added). The hearing was then adjourned.

In its "Memorandum Opinion and Order" entered four days later, the district court, in summarizing the procedural setting, noted that

> At the hearing of [the summary judgment] motions, plaintiffs' counsel advised the Court that defendant United States was dismissed from the action. Without the federal defendant there is no longer any basis for federal jurisdiction because diversity does not exist among the remaining parties. Defendants asked the court to retain jurisdiction solely for the purpose of deciding [the federal-immunity issue]."

J.A. 323 (emphasis added).

After having then addressed the merits of the immunity issue, the court opined that, "The defendants are not entitled to absolute immunity . . . and their motion [for summary judgment on that basis] must by DENIED . . . ." J.A. 325. Then, noting that the defendants also had raised a defense of judicial proceeding evidentiary privilege, the court observed that the standard under which such a privilege must be assessed was one of Virginia state law, and opined that "a determination of whether defendants have met this standard is better left to a Virginia tribunal." Id. (emphasis added). The court then "ORDERED that this action be remanded to [the state court] pursuant to 28 U.S.C. § 1447(c)."

I deduce from this course of proceedings, despite some obvious confusion at points along the way and flat error in the end as to the court's power to remand, the following evolution of the district court's understanding of the matter. When the hearing began, the court had before it motions for summary judgment by both the United States (as substituted defendant pursuant to the Westfall Act certification) and the private defendants. Immediately upon finding out that the United States had been voluntarily dismissed as a party, and after learning upon inquiry that there was not diversity between the private parties, the court perceived and raised a possible question of its juris-

17

diction over the claim against the (now re-substituted?) ANSER defendants--but only in the form of a query to counsel. J.A. 307. Having, however, then heard the ANSER defendants' contention that by reason of their federal-immunity defense the court should "retain" its jurisdiction over the claims against them, and that in any event it could do so under the Gibbs rule, the court plainly acquiesced in the assertion that it did have jurisdiction to do so by its rhetorical comment that the jurisdiction was, however, "purely discretionary." J.A. 308. The fact that this was now the court's perception despite its earlier intimation of doubt as to whether it had any basis for jurisdiction is strongly borne out by what then occurred. First, the court proceeded to consider the opposing arguments of counsel on the substantive defense, expressing no more doubts about its jurisdiction to do so. This alone might have indicated nothing more than conditional consideration, with the jurisdictional question being reserved. That is belied, however, by later comments that plainly indicate the court's continued belief down to entry of its remand order that it had jurisdiction of the claims against the ANSER defendants, but that it also had discretionary power (as in the erroneously-suggested Gibbs situation) not to exercise that jurisdiction once the federal defense to those claims had been ruled out. Specifically, the court indicated to counsel at that point that if it decided against immunity, it would remand the case to state court because the issues then remaining would be essentially state law issues, and it would be "more appropriate for them to be handled in a state court", not that they must be handled there for lack of its own jurisdiction.

That this perception of the basis for its power to remand persisted to the time the remand order was entered is then confirmed in the Memorandum Opinion supporting the remand. There again, the court opined that with the case now involving only state law issues of claim and defense, these were "better left to a State tribunal", not that they must be remanded because of the court's lack of jurisdiction to determine them. In the face of this compelling evidence, the final citation to § 1447(c) can only be understood as simple inadvertence, and we certainly may do so.

On this basis, I conclude that review of the remand order, because not actually based on either of the grounds specified in § 1447(c), is not barred by § 1447(d).

18

C.

That leads, however, to the further question whether the remand order is otherwise barred from review as an interlocutory order. Here, the law is plain. It may not be reviewed by appeal because it does not qualify as an appealable collateral order under the Cohen doctrine, but it may be reviewed, if sufficiently egregious in error, by mandamus. See Thermtron, 423 U.S. at 352-53. And, we may treat a notice of appeal as a petition for mandamus when the stringent conditions for issuing that writ are present. See Jamison v. Wiley, 14 F.3d 222, 234 (4th Cir. 1994). Here, they are. The result of allowing this remand order to stand, even if erroneous, would be wrongly and unnecessarily to fragment a claim between state and federal courts in a way fraught with mischief and capable of producing unnecessary tensions between the two systems. Principally, it could present difficult and unresolved issues of a state court's power to re-examine a federal court's decision on a federal-immunity defense to a remanded state-law claim, and beyond that to inconsistent decisions were the state court to consider itself free to re-examine the issue. The conditions for mandamus review are therefore present and, accordingly we should treat the notice of appeal as a petition for the writ.

D.

This then leads to the question whether the district court did have the discretionary power it purported to exercise to remand the state claim after having denied the federal-immunity defense to it.

On that issue, I am satisfied the court did not have that power but was obliged to exercise its removal jurisdiction to resolve the whole claim. I am aware of no direct authority for this conclusion in an exactly comparable procedural setting. But it is supported by reasoning from analogous situations.

Had the ANSER defendants also petitioned for removal--as they properly could have under § 1442(a)(1), the federal officer removal statute--there would be specific case authority for this result. We held in Jamison that in that situation, once removal jurisdiction attached it was not thereafter defeated by rejection of the immunity defense, and that there was accordingly no power under § 1441(c) to

19

remand the claim. Jamison v. Wiley, 14 F.3d 222, 239 (4th Cir. 1994). Here, though removal was effected by the United States under the Westfall Act, 28 U.S.C. § 2679, the effect recognized in Jamison surely must be the same: that the jurisdiction properly acquired by the removal was effectively mandatory and did not permit a discretionary remand following denial of the federal immunity defense. As Jamison recognized, the two removal provisions are complementary in their intended operation, providing alternative means for getting such claims into the federal courts on the basis of the federal immunity defense. See id at 237-38 & n.16. Compare Carnegie Mellon v. Cohill, 484 U.S. 343 (1988) (when removal jurisdiction is based on § 1441(a), district court has power to remand--rather than dismiss without prejudice--pendent state-law claim following dismissal of federal claims).

On this basis, I conclude that the district court erred in ordering a remand of the claim (with the federal-immunity defense rejected) to state court, and that it must therefore be vacated.

II

As to our jurisdiction to review the immunity ruling, I agree with Judge Niemeyer that under Nixon v. Fitzgerald , 457 U.S. 731, 743 (1982), it is reviewable under the Cohen doctrine as a collateral order denying absolute immunity. But I believe that our contemporaneous vacatur of the remand order makes more certain--perhaps is essential to--the immunity ruling's required finality as a collateral order, since it removes any question of possible state court power to re-examine that issue. Furthermore, that vacatur removes any need for concern whether the remand order was one "preceding it in logic and fact." See Jamison, 14 F.3d at 233.

O R D E R

For the reasons given in parts I, III, and IV of Judge Niemeyer's opinion and the entirety of Judge Phillips' opinion, we reverse the district court's order denying the defense of absolute immunity, vacate

20

the district court's remand order, and remand the case to that court with instructions to dismiss the action.

<u>IT IS SO ORDERED</u>

MICHAEL, Circuit Judge, dissenting:

I would dismiss this appeal because we do not have jurisdiction to hear it. Because my able colleagues have taken jurisdiction, I must also disagree with them on the substantive question. We are giving away too much by granting absolute immunity to a government contractor who is under no compulsion to report government employee misconduct. I respectfully dissent.

I.

A.

This action, which was filed in the Circuit Court of Arlington County, Virginia, included Lt. Col. James Rooney of the United States Air Force as a defendant. Pursuant to 28 U.S.C. § 2679(d)(2) the United States certified that Lt. Col. Rooney was "acting within the scope of his . . . employment at the time of the incident out of which the [Mangolds'] claim arose." The action, therefore, was deemed to be one brought against the United States. The United States removed it to federal court under § 2679(d)(2) and was substituted (by order) as a defendant in place of Lt. Col. Rooney.

Later, on January 27, 1994, a consent order dismissed the case against the United States with prejudice. Meanwhile, ANSER (the corporate defendant) and the individual defendants moved for summary judgment on the ground that the doctrine of absolute immunity barred the action against them. The district court heard this motion on January 28, 1994, the day after the United States was dismissed. At the beginning of the hearing the district court noted that with the United States dismissed, "there is no longer any basis for Federal jurisdiction." Defense counsel nevertheless asked the court to retain jurisdiction in order to decide the immunity question. The court then heard argument on immunity and ended the hearing by saying: "If I

21

do not grant [summary judgment to the defendants], I will be referring [the case] back to the Arlington court, because these are issues of essentially State law that are involved in the case. It's more appropriate for them to be handled in a State court." The court indicated that it would rule quickly.

Four days later, on February 1, 1994, the district court issued a memorandum opinion and order. First, before taking up the immunity issue, the court decided, "Without the federal defendant there is no longer any basis for federal jurisdiction because diversity does not exist among the remaining parties." But the court said it was "retain[ing] jurisdiction," at the request of the defendants, "solely for the purpose of deciding whether defendants' actions are entitled to an absolute immunity because the allegedly defamatory statements were made within the context of an Air Force investigation." The court next discussed immunity and decided that "the defendants are not entitled to absolute immunity." The court then returned to the jurisdictional issue and ordered the action remanded to Virginia state court under 28 U.S.C. § 1447(c). The defendants appealed the order of February 1, 1994, and also petitioned for a writ of mandamus. We denied the mandamus petition on March 22, 1994. We should now dismiss the appeal because we have no jurisdiction to consider it.

B.

The district court's immunity ruling is included in its remand order of February 1, 1994, and that order is before us on this appeal. The order is first and last a remand order. The district court decided the jurisdictional issue first, and only after announcing that it lacked subject matter jurisdiction did it turn to immunity. Because the ruling on immunity was incidental to the order's essence -- remand to the Virginia court -- the immunity ruling was not conclusive. I do not see any way that we have jurisdiction to review the remand order or any of its discussion about immunity.

1.

Congress has denied us the jurisdiction to review remand orders: "An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise," except in limited

22

circumstances not relevant here. 28 U.S.C. § 1447(d). This rule has long been a part of American jurisprudence. See , e.g., Railroad Co. v. Wiswall, 90 U.S. (23 Wall.) 507, 508 (1875); Mason v. Calloway, 554 F.2d 129, 130 (4th Cir.) (per curiam), cert. denied, 434 U.S. 877 (1977). Indeed, we have held that a district court lacks power even to reconsider its own remand order. Three J Farms, Inc. v. Alton Box Board Co., 609 F.2d 112 (4th Cir. 1979), cert. denied, 445 U.S. 911 (1980). See also John Steinman, Removal, Remand, and Review in Pendent Claim and Pendent Party Cases, 41 Vand. L. Rev. 923, 997 nn. 349-50 (1988) (collecting cases).

The rule of non-reviewability is designed to allow cases to proceed expeditiously to the merits. In other words, we are to avoid long, technical disputes about whether cases should be in state or federal court. "Congress, by the adoption of [the rule of non-reviewability of remand orders] established the policy of not permitting interruption of the litigation of the merits of a removed cause by prolonged litigation of questions of jurisdiction of the district court to which the cause is removed." United States v. Rice, 327 U.S. 742, 751 (1946). See also In re Providencia Devel. Corp., 406 F.2d 251, 252 (1st Cir. 1969) ("The action must not ricochet back and forth depending on the most recent determination of a federal court."); Charles A. Wright, Law of Federal Courts 253-54 (1994) ("This ban on review is intended to spare litigants delay.").

There is an exception to the rule of non-reviewability, the "Thermtron exception." If the district court orders remand for a reason not authorized by 28 U.S.C. § 1447(c),**1** the remand order may be challenged in the court of appeals by a petition for a writ of manda-

_____

**1** The authorized reasons for remand are "defect in removal procedure" and "lack[ ] [of] subject matter jurisdiction" "at any time before final judgment." 28 U.S.C. § 1447(c). The current version of § 1447 was enacted in 1988. 102 Stat. 4670 (Pub. L. No. 100-702, Nov. 19, 1988). Previously, remand was required if "the case was removed improvidently and without jurisdiction." See 28 U.S.C.§ 1447(e) (1940). An earlier statute required remand whenever the district court found that the case was "improperly removed." 36 Stat. 1095 (Pub. L. No. 61-475, Mar. 3, 1911). The earliest history of the rule of non-reviewability of jurisdictional remand orders is discussed at length in Rice, supra.

mus. Thermtron Prods., Inc. v. Hermansdorfer, 423 U.S. 336, 351-52 (1976) (remand order based on crowded docket was reviewable). See also Kolibash v. Comm. on Legal Ethics of W. Va. Bar , 872 F.2d 571, 573 (4th Cir. 1989) (remand order "represent[ing] a discretionary decision . . . not to hear a certain case on grounds of public policy" was reviewable).

The scope of the Thermtron exception is extremely narrow. See, e.g., Things Remembered, Inc. v. Petrarca , 116 S. Ct. 494, 498 (1995) (Kennedy, J., concurring); Gravitt v. Southwestern Bell Tel. Co., 430 U.S. 723, 723 (1977) (per curiam) ("The district court's remand order was plainly within the bounds of § 1447(c) and hence was unreviewable by the Court of Appeals, by mandamus or otherwise."); Volvo of Am., Corp. v. Schwarzer. 429 U.S. 1331 (Rehnquist, Circuit Justice 1976) (denying stay of remand order). Courts rarely invoke the Thermtron exception. See Steinman, 41 Vand. L. Rev. at 999 n.364. (collecting cases). "As the Supreme Court has stated, when a district court remands a case on grounds contained in the statute `his order is not subject to challenge in the court of appeals by appeal, by mandamus, or otherwise.'" Washington Suburban Sanitary Comm'n v. CRS/Sirrine, Inc., 917 F.2d 834, 836 (4th Cir. 1990) (quoting Thermtron, 423 U.S. at 343). Accord Wilkins v. Rogers, 581 F.2d 399, 402-03 (4th Cir. 1978) (per curiam); Noel v. McCain, 538 F.2d 63, 635 (4th Cir. 1976); Wright, supra at 253 n.25 (1994).

Here, the district court said that remand was based on a statutory ground under § 1447(c), lack of subject matter jurisdiction. Near the beginning of the hearing on the defendants' summary judgment motion, the court interrupted defense counsel and said, "there is no longer any basis for Federal jurisdiction." At the end of the hearing, the court reiterated its belief that the case belonged in state court. Before discussing immunity in its written opinion and order, the district court expressly found that subject matter jurisdiction was lacking.[2] Finally, the district court's order contained the magic reference to

_____

**2** By contrast, Carnegie Mellon Univ. v. Cohill, 484 U.S. 343 (1987), and In re Surinam Airways Holding Co., 974 F.2d 1255, 1257 (11th Cir. 1992), upon which the majority relies, did not involve remand orders justified on the ground that jurisdiction was lacking. Thus, in those cases the district courts did not invoke § 1447(c).

24

§ 1447(c): "it is hereby ORDERED that this action be remanded to the Circuit Court of Arlington County in the Commonwealth of Virginia pursuant to 28 U.S.C. § 1447(c)." Because the remand order expressly rested on the statute, the Thermtron exception does not apply and this court has no power to review the district court's order.

The majority has concluded that the district court's invocation of § 1447(c) was simple inadvertence. But even if the district court relied on § 1447(c) erroneously, we still have no power to review the remand order. "[T]he words are indeed magic ones: the order is proof against review even if it merely `purports' to remand on the ground quoted." Richards v. Federated Dep't Stores, Inc., 812 F.2d 211, 212 n.1 (5th Cir.) (per curiam), cert. denied, 484 U.S. 824 (1987). "Under both Gravitt and Thermtron, a remand order made pursuant to § 1447(c) cannot be reviewed if it is based on the grounds that the court lacks jurisdiction -- even if the court's jurisdictional analysis was erroneous." Kunzi v. Pan American World Airways, Inc., 833 F.2d 1291, 1292 (9th Cir. 1987). See also Briscoe v. Bell, 432 U.S. 404, 414 n.13 (1977) ("review is unavailable no matter how plain the legal error in ordering the remand"); Hansen v. Blue Cross of California, 891 F.2d 1384, 1387 (9th Cir. 1989) ("Section 1447(d) precludes review of a district court's jurisdictional decision even if it was clearly wrong.").

2.

The majority says that the immunity ruling is reviewable under the collateral order doctrine described in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949); Nixon v. Fitzgerald, 457 U.S. 731 (1982); and Jamison v. Wiley, 14 F.3d 222, 230 (4th Cir. 1994). I disagree.

In Jamison v. Wiley, a remand order held reviewable by mandamus under the Thermtron exception also contained a ruling that the defendant (a federal employee) was not entitled to have the United States substituted for him as defendant under the Westfall Act, 28 U.S.C. § 2679. We held that the substitution portion of the removal order "was appealable under Cohen because it finally and conclusively denied a claim of absolute immunity." Jamison , 14 F.3d at 234.

25

The reliance on Jamison is misplaced for three reasons. First, the remand order there was not a § 1447(c) order. Instead, the district court in Jamison described its action as a discretionary remand; it did not rest on § 1447(c). Id. at 233. Here, by contrast, we have a § 1447(c) remand based expressly on the lack of subject matter jurisdiction. This leaves us without a basis for federal appellate jurisdiction. In short, the case is gone, and we have no hook with which to pull it back into federal court for any purpose, including appellate review.

Second, the immunity ruling here, unlike the substitution decision in Jamison, is within § 1447(d)'s barrier to appeal because the immunity ruling did not "precede [the] order of remand, both `in logic and in fact.'" Jamison at 233 (quoting Waco v. United States Fidelity & Guar. Co., 293 U.S. 140, 143 (1934)). In Jamison we noted that the district court made the substitution ruling "before it decided to remand the case to state court, while it still had control of the case. That decision, which was made prior to, and is separable from, the decision to remand, is not subject to the limitations of § 1447(d)." Id. at 233 (emphasis in original). The immunity decision in the order before us can perhaps be separated conceptually from the remand decision, but the mere fact of separability is not enough under Waco. Waco is of no help because the immunity decision here was made after the district court decided to remand the case. 3 Jamison implicitly recognized that § 1447(d) prevents appellate review of collateral rulings made by a district court after its remand decision.

Third, Jamison does not permit an appeal here because the district court's order did not "finally and conclusively[deny] a claim of absolute immunity." See id. at 234. In Nixon v. Fitzgerald, 457 U.S. 731 (1982), the Supreme Court held that an interlocutory order denying absolute immunity to a defendant about to go to trial in the district court was appealable as a collateral order under Cohen. We have observed that delaying an appeal from an order denying absolute

_____

3 The Waco doctrine also does not apply because (as I discuss below) the district court's immunity ruling would not bind the Virginia courts. "City of Waco focused on the need to provide appellate review of findings that are conclusive on the rights of the parties." Nutter v. Monongahela Power Co., 4 F.3d 319, 321 (4th Cir. 1993) (emphasis supplied).

26

immunity "would defeat [the defendant's] claim that he should not be put to trial, which is the initial protection of absolute privilege." Smith v. McDonald, 737 F.2d 427 (4th Cir. 1984), aff'd, 472 U.S. 479 (1985).

The district court's order neither "finally determined," see Cohen, 337 U.S. at 546, nor "finally and conclusively denied a claim of absolute immunity," see Jamison, 14 F.3d at 234. Nor did the defendants face the imminent jeopardy of trial after the district court entered its remand order.

On remand the Virginia courts would quickly recognize that the district court's immunity ruling did not have preclusive effect. See Nutter, 4 F.3d at 322 ("any issues that the district court decided incident to remand may be relitigated in state court"); McIntosh v. Atchison, T. & S.F. Ry., 872 P.2d 11 (Kan. App. 1984) (ignoring federal court's pre-remand conclusions of law). In particular, the law of the case doctrine does not bind the Virginia courts to accept the federal district court's immunity ruling. Steinman v. Clinchfield Coal Corp., 93 S.E. 684, 688 (Va. 1917) ("the doctrine of the`law of the case' does not apply to a former decision, in unended litigation, by a court of a foreign jurisdiction").[4] Even if the law of the case doctrine was to apply, the Virginia courts would still have the power to revisit and redetermine the immunity question. See, e.g., Capital Investors Co. v. Executors, 584 F.2d 652, 654 (4th Cir. 1978) ("the principle [of law of the case] is not absolute nor inflexible."), cert. denied, 440 U.S. 981 (1979); Wilson v. Volkswagen of America, Inc., 445 F. Supp. 1368, 1370 (E.D. Va. 1978) ("the law of the case doctrine `is not an inexorable command.'") (quoting Wm. G. Roe & Co. v. Armour & Co., 414 F.2d 862, 867 (5th Cir. 1969)).

The district court's remand order does not force the defendants to trial immediately. The defendants would be free to raise the defense

_____

[4] Although Steinman's validity has been questioned, Timms v. Rosenblum, 713 F. Supp. 948, 954 n.13 (E.D. Va. 1989), aff'd, 900 F.2d 256 (4th Cir. 1990), no Virginia court has given any sign that Steinman would not be followed. Indeed, the case was cited as good law as recently as 1993. American Filtrona Co. v. Hanford, 428 S.E.2d 511, 514 (Va. App. 1993).

of immunity before the Virginia courts. Indeed, state courts regularly rule on federal immunity defenses, see e.g., Cooney v. White, 845 P.2d 353 (Wyo.), cert. denied, 114 S. Ct. 60 (1993), and I am confident that the Virginia courts are well equipped to deal with the issue in this case.

There is no statute, doctrine or rule that allows an appeal of the district court's immunity ruling.

C.

It is tempting to do what the majority has done in this case, that is, step back in the quiet of appellate review and try to figure out what the district court really meant, regardless of its exact words. Until today there was at least one instance where that could not be done: where, as here, a district court ordered remand (even erroneously) using the magic words of § 1447(c), review of that order was prohibited under § 1447(d). Whatever the shortcomings of that rigid rule, it had the benefits of preventing procedural wrangling and of letting the parties know quickly and decisively whether they were going to be in state or federal court. I do not believe it is up to us to take away any of the benefits of that statutory rule.

II.

The majority's election to reach the immunity question forces me to disagree a second time today. I disagree with the majority's unprecedented step of granting absolute immunity to a government contractor who was not acting pursuant to any duty imposed by contract, statute or regulation. I do believe that the contractor and its employees are entitled to a First Amendment qualified privilege. But the long step from qualified to absolute immunity is a step too far.

A.

The Mangolds allege that the defendants engaged in a campaign of lies against Col. Mangold with the intent to ruin his career and that his career was ruined. The defendants say that they voluntarily responded to queries from Air Force investigators because Col. Man-

28

gold was pressuring them to hire his wife's friend. At bottom, the defendants claim that they may complain about alleged misconduct of a government official to his superiors.

The defendants do have the important privilege to report misconduct, but the privilege is not absolute. The only privilege defendants have is grounded in the First Amendment's Petition Clause: "the right of the people . . . to petition the Government for a redress of grievances." See McDonald v. Smith, 472 U.S. 479, 483 (1985). However, the Petition Clause does not give those who complain about the conduct of government officials an absolute right to tell lies about those officials. Id.; White v. Nicholls, 44 U.S. (3 How.) 266 (1845); Bradley v. Computer Sciences Corp., 643 F.2d 1029, 1033 (4th Cir.), cert. denied, 454 U.S. 940 (1981). A charge of misconduct against a government official is privileged so long as the person making the charge does not act with "actual malice," as that term is defined in First Amendment free speech/free press jurisprudence. McDonald, 472 U.S. at 484-85. See also New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964) (actual malice is knowing falsity or reckless disregard for whether a statement is true or false). Cf. Thorne v. Bailey, 846 F.2d 241, 245 (4th Cir.) (Petition Clause claim analyzed in accord with First Amendment free speech principles), cert. denied, 488 U.S. 984 (1988).

"[T]hose who conspire intentionally to defame a federal officer in order to effect that official's discharge" are not protected by the First Amendment and may be sued for damages. Windsor v. The Tennessean, 719 F.2d 155, 162 (6th Cir. 1983), cert. denied, 469 U.S. 826 (1984). This rule has long been recognized:

> an individual, who maliciously, wantonly, and without probable cause, asperses the character of a public officer in a written or printed paper, delivered to those who are invested with the power of removing him from office, is responsible to the party injured in damages, although such paper is masked under the specious cover of investigating the conduct of such officer for the public good. Public policy demands no such sacrifice of the rights of persons in an official capacity, nor will the law endure such a mockery of its justice.

29

Gray v. Pentland, 2 Serg. & R. 23, 25 (Pa. 1815) (quoted in McDonald, 472 U.S. at 483-84).

In short, "[t]he right to petition is guaranteed; the right to commit libel with impunity is not." McDonald, 472 U.S. at 485. That is where I would draw the line for the private contractors in this case, because granting them absolute immunity gives them the right to tell deliberate lies without fear of civil damages.

B.

The majority concludes that absolute immunity should be extended to the private contractors here to promote the public interest of stamping out fraud, waste and mismanagement in government. This means, of course, that if Col. Mangold is correct that the defendants lied and ruined his career, he is without any remedy whatever.

I do agree that in the limited instances when private contractors are obligated to speak, they should be granted absolute immunity. If the defendants answered questions from the Air Force investigators because they had a pre-existing, contractually-defined duty to do so, then absolute immunity would be proper. Becker v. Philco Corp., 372 F.2d 771, 775 (4th Cir.) ("an utterance plainly commanded by the duties of the author to the government has been repeatedly recognized as unconditionally privileged") (emphasis supplied), cert. denied, 389 U.S. 979 (1967). Similarly, if a statute or Defense Department regulations had imposed detailed reporting duties on the defendants, they should have complete immunity. See Bushman v. Seiler, 755 F.2d 653, 655 (8th Cir. 1985) (Medicare providers granted absolute immunity for carrying out "administrative responsibilities that the law imposes").[5]

_____

[5] The majority's citation to Boyle v. United Technologies Corp., 487 U.S. 500 (1988), is not apposite. Boyle provides that a defense contractor may not be held liable for certain kinds of products liability claims if "(1) the United States approved reasonably precise specifications" for the equipment produced and sold to the government, "(2) the equipment conformed to those specifications, and (3) the supplier warned the United States about the dangers" of using the equipment. Id. at 512. The scope of the Boyle privilege is extremely narrow and has no relevance here. See id. at 505 n.1.

30

These defendants, however, were under no duty to report Col. Mangold's alleged misconduct. Their decision to talk to Air Force investigators was voluntary and was not compelled by any particular contract, regulation or statute. See Group Health Inc. v. Blue Cross Ass'n, 625 F. Supp. 69, 78-79 (S.D.N.Y. 1985) (denying a claim of absolute immunity), appeal dismissed, 793 F.2d 491 (2d Cir. 1986), cert. denied, 480 U.S. 930 (1987).

When determining whether absolute immunity should be granted, courts must balance the harm to individual rights against the need to promote "effective government." Westfall v. Erwin, 484 U.S. 292, 295-97 (1988). Certainly, granting these defendants absolute immunity promotes effective government to some degree. Absolute immunity encourages voluntary cooperation with the government's efforts to investigate wrongdoing by its employees. But Westfall requires a cost-benefit analysis, and the difficult question presented in this case is whether, at the margin, the benefit resulting from a move from qualified to absolute immunity outweighs the costs that move imposes on government employees who are the target of complaints. See id. at 296 n.3.

Here the marginal costs are substantial. Qualified immunity limits, but does not eliminate, the rights of targeted employees. The move from qualified to absolute immunity, however, is quite a jump because absolute immunity completely extinguishes the rights even of those employees who have suffered serious wrongs."[O]fficial immunity comes at a great cost. An injured party with an otherwise meritorious tort claim is denied compensation simply because he had the misfortune to be injured by [someone with immunity]. Moreover, absolute immunity contravenes the basic tenet that individuals be held accountable for their wrongful conduct." Id. at 295. An additional cost (or danger) of the move from qualified to absolute immunity stems from the fact that private government contractors are not subject to political control. They do not answer to the voter, nor do they answer to any official who does. There is thus no political check against the fully immunized contractor who becomes reckless or malicious in his zeal to expose a government employee. See Nu-Air Mfg. Co. v. Frank B. Hall & Co., 822 F.2d 987, 995 (11th Cir. 1987), cert. denied, 485 U.S. 976 (1988). The benefit to effective government of giving additional protection to government contractors who talk voluntarily does

31

not outweigh the harm caused by leaving government employees defenseless if they ever become the target of reckless and malicious charges.

C.

Nor can the majority's significant expansion of immunity be justified on the ground that the defendants are entitled to a species of testimonial immunity. What happened here -- statements given in an internal (non-public) Air Force investigation -- strays too far from the core use of testimonial immunity. We give witnesses in certain judicial proceedings, such as trials, absolute immunity so they will feel free to testify fully and truthfully without fear of being sued for the words they speak under oath.**6**

The trial (or adversarial) process contains safeguards to aid in the search for truth. Most importantly, trial witnesses are subject to cross-examination. See Briscoe v. LaHue, 460 U.S. 325, 342 (1983). See also Williams, 844 F.2d at 142 (presence of the"tools of the judicial process" justifies grant of absolute immunity from civil suit). A trial also is a public proceeding, and a witness is less likely to lie if he knows that his lies will be exposed to the entire world.**7**

_____

**6** **Holmes v. Eddy**, 341 U.S. 477(4th Cir.) (per curiam), cert. denied, 382 U.S. 892 (1965), cited by the majority, is best understood as a judicial proceedings immunity case. There the defendant assisted the Securities and Exchange Commission in the prosecution of an ongoing civil action.

**7** Indeed, some courts have refused to grant absolute immunity for statements made during judicial proceedings lacking the truth-promoting safeguards of trial in open court. See Malley v. Briggs, 475 U.S. 335 (1986) (police officer not entitled to absolute immunity for false statements made in warrant application); Anthony v. Baker, 955 F.2d 1395, 1400-01 (10th Cir. 1992) (not all grand jury testimony is absolutely privileged); Wheeler v. Cosden Oil & Chem. Co., 734 F.2d 254, 261 (absolute immunity denied for statements made during pretrial hearing), modified on other grounds, 744 F.2d 1131 (5th Cir. 1984); Cox v. County of Suffolk, 780 F. Supp. 103, 108 (E.D.N.Y. 1991) (not all grand jury testimony is absolutely privileged); White v. Frank, 680 F. Supp. 629, 638 (S.D.N.Y.) (same), appeal dismissed, 855 F.2d 956 (2d Cir. 1988). But see Strength v. Hubert, 854 F.2d 421, 423-24 & n.2 (11th Cir. 1988) (granting absolute immunity from civil suit to grand jury witness); Kincaid v. Eberle, 712 F.2d 1023 (7th Cir.) (per curiam) (same), cert. denied, 464 U.S. 1018 (1983).

32

Here, Col. Mangold had no opportunity to confront or cross-examine his accusers. With absolute immunity, there is no check against what they might have said in a shrouded, internal investigation. I realize that government investigators need the cooperation of private contractors who witness wrongdoing, but absolute immunity is too broad a brush for the delicate task of ensuring honest cooperation.

D.

A First Amendment/Petition Clause approach goes just far enough to protect the substantial public interest in bringing the misconduct of public employees or officials to light. The qualified privilege under the Petition Clause is a powerful privilege, and it is one that will adequately protect those who cooperate honestly with government investigations. Even if a whistleblower is "motivated by financial self-interest, and [is] aware of and pleased by the prospect of injury resulting to the official complained of," the accused employee may not recover damages absent proof by clear and convincing evidence that his accusers made statements that were knowingly or recklessly false. Bradley, 643 F.2d at 1033. Accord Stern , 547 F.2d at 1329.

Again, I recognize the importance of ferreting out wrongdoing by public officials and employees. My point is that false and malicious charges of wrongdoing can be made. For those instances I would like to leave the victim some protection. There is no protection when the accuser in an internal investigation is given absolute immunity. I respectfully dissent because I think qualified immunity is sufficient.

33